Exhibit B

Case 1:18-cv-05775-ERK-CLP Document 1 Filed 10/16/18 Page 2 of 23 PageID #: 31

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

STAR AUTO SALES OF BAYSIDE, INC.     :
(d/b/a STAR TOYOTA OF BAYSIDE),     :
STAR AUTO SALES OF QUEENS, LLC     :
(d/b/a STAR SUBARU), STAR HYUNDAI LLC     :
(d/b/a STAR HYUNDAI), STAR NISSAN, INC.     :
(d/b/a STAR NISSAN), METRO CHRYSLER     :
PLYMOUTH INC. (d/b/a STAR CHRYSLER     :
JEEP DODGE), STAR AUTO SALES OF     :
QUEENS COUNTY LLC (d/b/a STAR FIAT)     :
and STAR AUTO SALES OF QUEENS     :
VILLAGE LLC (d/b/a STAR MITSUBISHI),     :
    :
        Plaintiffs,     :
    :
        v.     :
    :
VOYNOW, BAYARD, WHYTE     :
AND COMPANY, LLP, HUGH WHYTE,     :
RANDALL FRANZEN and ROBERT SEIBEL,     :
    :
        Defendants.     :

-------------------------------------------------------------x

\_\_\_ cv \_\_\_

**COMPLAINT**

(Jury Trial Demanded)

        Plaintiffs Star Auto Sales of Bayside, Inc. (d/b/a Star Toyota of Bayside), Star

Auto Sales of Queens, LLC (d/b/a Star Subaru), Star Hyundai LLC (d/b/a Star Hyundai), Star

Nissan, Inc. (d/b/a Star Nissan), Metro Chrysler Plymouth Inc. (d/b/a Star Chrysler Jeep

Dodge), Star Auto Sales of Queens County LLC (d/b/a Star Fiat) and Star Auto Sales of

Queens Village LLC (d/b/a Star Mitsubishi), by their attorneys, Trachtenberg Rodes &

Friedberg LLP, allege for their Complaint herein as follows:

### *Introduction*

        1.     This is an action for professional malpractice and breach of contract

against a firm of certified public accountants and certain of its principals.

Case 1:18-cv-05775-ERK-CLP Document 1 Filed 10/16/18 Page 3 of 23 PageID #:3

2.      The individual plaintiffs ("Plaintiffs" or, collectively, the "Star Auto Group") are a group of seven commonly owned and operated automobile dealerships in Queens.

3.      Defendant Voynow, Bayard, Whyte and Company, LLP ("Voynow") is full-service accounting firm located in Trevose, PA, which claims, among other things, a special expertise in providing accounting services to automobile dealerships across the eastern United States.  The individual defendants Hugh Whyte ("Whyte"), Randall Franzen ("Franzen") and Robert Seibel ("Seibel") (with Voynow, "Defendants" or the "Voynow Defendants") are principals or employees of Voynow and were responsible for the Star Auto Group account for many years.

4.      As set forth below in greater detail, Plaintiffs engaged the Voynow Defendants to provide a broad range of accounting services over a period of years, including among other things assistance regarding month and year end closings, reconciling and finalizing year end balances for tax purposes and preparing and filing tax returns for all of Plaintiffs' related entities.

5.      As further set forth below, despite its purported expertise in the particulars of automobile dealership operation and accounting, however, Voynow repeatedly and consistently failed to notice and/or report to Plaintiffs a number of red flags, many of which arose from practices that are typical in the automobile dealership industry, that would have alerted to management the systematic and widespread theft and fraud that certain of Plaintiffs' principal bookkeeping employees were perpetrating over a period of years.

6.      Indeed, it turns out that Plaintiffs' key accounting employees – the very same employees with whom Voynow worked so closely on a regular basis – stole as much $10 million from Plaintiffs.  The thefts went on for an extended period of time, and produced a variety of conditions in Plaintiffs' books and records that should have been noticed by the accountants.  Defendants never noticed, however, or investigated any number of red flags that would have caused any careful and prudent accountant, even one not steeped in the automobile dealership world, to seek explanation and/or to notify management.

7.      In short, Voynow failed in spectacular fashion to do its job here. Defendants failed to exercise the most ordinary standards of care.  Defendants failed to live up to their purported dealership expertise.  Defendants failed to make clear to Plaintiffs each year that Defendants were not paying close attention to the accounting numbers.  Defendants permitted themselves to get too close to the client and its accounting personnel.  Defendants even had an independent relationship with the theft ringleader, preparing her personal taxes for an extended period of time at the same time she was stealing from Plaintiffs wantonly.

8.      Defendants' failures, many examples of which are set forth below, caused Plaintiffs to suffer obvious and enormous damages.  Had Defendants done their job, these thieving employees would not have been able to get away with their massive frauds at all or for so long.

9.      Plaintiffs are pursuing their former employees criminally and civilly, of course, but it is unlikely that they will be able to recover anything close to what was stolen. This action is therefore necessary for Plaintiffs to recover for these massive frauds and their professional accountants' failure to see it or report it to them.

3

Case 1:18-cv-03725-ERK-CLP Document 17-2 Filed 10/19/18 Page 5 of 23 PageID #:34

***The Parties***

10.     Plaintiff Star Auto Sales of Bayside, Inc. ("Star Toyota") is a New York corporation with its principal place of business at 205-11 Northern Boulevard, Bayside, New York.

11.     Plaintiff Star Auto Sales of Queens, LLC ("Star Subaru") is a New York limited liability company with its principal place of business at 206-02 Northern Boulevard, Bayside, New York.

12.     Plaintiff Star Hyundai LLC ("Star Hyundai") is a New York limited liability company with its principal place of business at 201-16 Northern Boulevard, Bayside, New York.

13.     Plaintiff Star Nissan, Inc. ("Star Nissan") is a New York corporation with its principal place of business at 206-02 Northern Boulevard, Bayside, New York.

14.     Plaintiff Metro Chrysler Plymouth Inc. ("Star Chrysler Jeep Dodge") is a New York corporation with its principal place of business at 211-10/34 Jamaica Avenue, Queens Village, New York.

15.     Plaintiff Star Auto Sales of Queens County LLC ("Star Fiat") is a New York limited liability company with its principal place of business at 211-10 Jamaica Avenue, Queens Village, New York.

16.     Plaintiff Star Auto Sales of Queens Village LLC ("Star Mitsubishi") is a New York limited liability company with its principal place of business at 211-44 Jamaica Avenue, Queens, New York and 206-02 Northern Boulevard, Bayside, New York.

17.    Defendant Voynow is a limited liability partnership organized under the laws of Pennsylvania, with its principal place of business at 1210 Northbrook Drive, Suite 140, Trevose, Pennsylvania 19053.

18.    Defendant Whyte is a citizen of Pennsylvania.

19.    Defendant Franzen is a citizen of New Jersey.

20.    Defendant Seibel is a citizen of Pennsylvania.

### *Jurisdiction and Venue*

21.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332, as all Plaintiffs are diverse to all Defendants and the amount in controversy exceeds $75,000.

22.    This Court has personal jurisdiction over Defendants pursuant to CPLR §§ 302(a)(1), (2) and (3), as Defendants are alleged to have transacted business in New York, contracted elsewhere to provide services in New York, committed tortious acts in New York and/or committed tortious acts elsewhere that caused injury in New York, all as alleged in more detail below.

23.    This court is the proper venue for this dispute pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events and omissions giving rise to this action occurred in this district.

### *Voynow's Dealership Practice*

24.    At all relevant times, Voynow has represented to the public that a "main focus" of its practice is the "retail automotive sales" industry.  In particular, Voynow has represented to its automobile dealership clients that its "specialized knowledge permits us to render accounting, tax planning, management advisory and other related services in the

most sophisticated of scenarios, linked to each client's needs."

      25.    Voynow has also represented to its automobile dealership clients that it is "committed" to "providing personalized services of the highest quality," and that it "ascribes to the Peer Review Program of the American Institute of Certified Public Accountant (sic) (AICPA)" and its "system of quality control."

      26.    More specifically, Voynow represents to its automobile industry clients that it provides "extensive" experience with "all types" of automobile industry "accounting systems," "franchise arrangements," "management styles" and industry relationships, including the following "specific" specialized services:

- "Analyses of automobile dealer financial statements;"

- "[E]valuation of operating results and departmental performance" based on "size, location and franchise;"

- "Study [of] interrelationships with service and parts activity and relative expense levels of such vital items as advertising, rent, payroll costs and interest;"

- Advising owners regarding buying and selling franchises;

- Application of LIFO and other automobile inventory management systems;

- "Advice in hiring key personnel and evaluation;"

- "Develop objective feasibility studies, projections and budgeting;"

- "Consultation with respect to analyzing and influencing banking arrangements;"

- "Design and implementation of specialized accounting systems and computer applications;" and,

- "Analysis of various alternative business decisions and their tax ramifications."

27.     Voynow has also represented to its automobile industry clients that it's "business practice is centered in management advisory service clients in a wide range of areas, such as cash management, profit planning, problem solving, organization and administration, accounting systems and support."

28.     Voynow has also represented to its automobile industry clients that it offers "assistance to plan and maintain the kinds of integrated management, information and control systems [that] may be required for effective, efficient and profitable operations."

29.     In sum, Voynow has promised its automobile industry clients professional services tailored specifically to their industry and their experiences represented to be consistent and even superior to general standards of care and conduct prevailing in the accounting industry.

### *Voynow's Work For The Star Auto Group*

30.     The Star Auto Group was first introduced to and started working with Voynow in 1996.

31.     At the outset of the relationship, Voynow stressed to the Star Auto Group its automobile dealership "focus" and specific expertise to induce Plaintiffs to work with it.

32.     During the twenty-one-year period from 1996 to 2017, Voynow provided a broad array of accounting, management and related services to Plaintiffs, including without limitation the following:

- Periodic consultations regarding various management and accounting issues, such as factory part reconciliations;

- Review and assistance of year end account balances and planning;

7

Case 1:18-cv-05775-ERK-CLP Document 17-2 Filed 10/19/18 Page 8 of 23 PageID #:38

- Year-end closing of the books, including review and reconciliation of manual and adjusting entries;

- Preparation of tax returns and work papers for each business entity in the Star Auto Group

- Preparation of individual tax returns and work papers for a number of the individual owners of Plaintiffs

- Preparation of various other tax documents and related work papers, such as 1099's, sales tax filings and certain reinsurance transaction filings.

- Periodic advice and consultations regarding Plaintiffs' automobile inventory financing arrangement with JPMorgan Chase;

- Assistance hiring or training certain key personnel; and,

- Advice regarding operating and accounting systems.

33. The specific terms and scope of Plaintiffs' engagement of Voynow each year varied according to the particular needs of the Plaintiffs in any given year.

34. The terms of all such engagements were based on oral discussions and course of practice, but in all cases included Defendants' promise to perform all such tasks in a professional and capable manner consistent with both its special claimed "expertise" and the highest standards of accounting industry professionalism.

35. Individual defendants Whyte, Franzen and Seibel were responsible for the Plaintiffs' account at Voynow and handled and/or supervised Defendants' work for Plaintiffs.

36. During the twenty-one-year period from 1996 to 2017, Voynow undertook these and related tasks as requested on an on-going basis, performed such tasks, billed for such tasks and were paid for such tasks.

37.     To accomplish the foregoing tasks, Defendants interacted with Plaintiffs and their senior accounting staff regularly regarding issues and needs as they arose.

38.     At least once each year, and often several times a year, Voynow sent a team of employees, along with Whyte, Franzen and Seibel at times, to Plaintiffs' administrative offices to pull together year end balances, to review manual accounting entries, to prepare year end adjusting entries and to otherwise review and collect data necessary to prepare tax materials and related assignments.

39.     At numerous other times during each year, Voynow team members accessed Plaintiffs' books and records remotely for various assignments, and had access to Plaintiffs' books and records at all times.

40.     At numerous other times during each year, Voynow team members actively engaged in communications with Plaintiffs and/or their banking representatives regarding the Star Auto Group's automobile inventory financing statements, and specifically the bank's queries regarding retained earnings issues.

41.     And, at all times, Voynow team members worked closely and on a regular basis with Plaintiffs' ownership and senior office managers and accounting personnel.

42.     Based on this long-standing and close working relationship, Voynow was intimately familiar with the Star Auto Group's accounting and management systems, its financial and accounting personnel and the specifics of its interrelated businesses.

43.     In addition, on information and belief, Voynow also had an independent relationship with Plaintiffs' office manager, Vivian Karouzakis ("Karouzakis"), and prepared her and her husband's personal tax returns for at least several years.

### *The Star Auto Group Employee Defalcations*

44.     Notwithstanding these long and close working relationships, the Voynow Defendants failed to notice and/or report to management that Plaintiffs' employees – most notably their other client, Karouzakis – were engaged in a massive pattern of theft.

45.     In fact, in or about December 2016, Plaintiffs discovered that Karouzakis was stealing corporate funds.  Plaintiffs were alerted to this not by Defendants but when an officer of their bank called to report that an employee was attempting to pay personal credit card bills and a personal home mortgage payment with company checks.

46.     Caught utterly by surprise, Plaintiffs initiated an investigation and discovered that Karouzakis was in fact stealing enormous sums across various of the affiliated dealerships in multiple schemes.

47.     Plaintiffs are still in the process of investigating the extent to which Karouzakis and other employees were stealing funds, but it is already apparent that over the past several years Karouzakis and others stole in excess of $10 million from Plaintiffs.

### *The Fallout: Plaintiffs Clean House*

48.     Plaintiffs immediately fired Karouzakis and filed a criminal complaint with the District Attorney's office in Queens.  Karouzakis has been indicted on numerous felony counts of grand larceny, criminal possession of stolen property and falsifying business records, and is being and will be prosecuted to the fullest extent of the law.

49.     Plaintiff also retained a forensic accounting firm and initiated a broad investigation of the extent of the thefts and the manner in which they were conducted.

50.     That investigation has revealed to date that Karouzakis and various other employees of Plaintiffs were also engaged in multiple theft and fraud schemes.  They,

too, were fired and are in the process of being prosecuted.

51.     Plaintiffs have also initiated, and are in the process of initiating, numerous civil lawsuits against the Karouzakis sisters and other former employees to recoup stolen funds.

52.     And, Plaintiffs also fired Voynow and retained a new accounting firm to restore Plaintiffs' accounting integrity.

### *The Voynow Defendants' Massive Failures*

53.     As noted, Plaintiffs used the Voynow Defendants for 21 years, and were under the false impression that Defendants were fully engaged in the most detailed aspects of their accounting and management environment.

54.     Based on its independent forensic review, however, Plaintiffs now allege that Defendants in fact failed to perform their accounting services for Plaintiffs in a professional, capable or competent manner over the years and failed to notice or investigate the following red flags:

55.     Numerous manual journal entries made by Karouzakis falsified "control" and/or "employee" numbers, which were used to obscure her exchange of intercompany checks for cash.  Voynow failed to notice or report the large number of irregular manual journal entries or that these transactions failed to clear the payroll cycle. Under this scheme, Karouzakis was able to steal as much as $565,424.65 from Plaintiffs since at least September 24, 2015.

56.     Numerous company checks were issued by Karouzakis to pay personal credit card bills and to repay a personal loan.  Many of these checks bore hand-written account notations.  In each instance, the account being offset was either a factory receivable

account, a "we-owe" account or a cost of sales account. Voynow failed to notice or report that a large number of checks were being issued to pay credit card bills and other personal obligations, that so many of the checks bore hand-written notations and that the various accounts to which the hand-written notations debited or credited those amounts were entirely and obviously inappropriate. Under this scheme, Karouzakis was able to steal as much as $486,776.61 from Plaintiffs since at least May 1, 2015.

57.     Numerous employee cash advances were recorded at Star Toyota for the period from December 2014 to February 2017. Many of these transactions bore unusual and irregular control numbers (e.g., "DEBB") in lieu of employee numbers and many of them were set off against manual journal entries rather than payroll, which would be typical and appropriate. In addition, many of these transactions were made using cash receipts from parts and service sales rather than payroll. Voynow failed to notice or report the unusual incidence of manual journal entries, the irregular control numbers and the improper flow of funds through irregular accounts. Under this scheme, Karouzakis and others were able to steal as much as $206,180.00 from Plaintiffs since at least December 1, 2014.

58.     Various employees used fraudulent accounting maneuvers to intentionally conceal improper and unauthorized automobile purchases from Plaintiffs for various family members and close friends for less than cost. The errant employees would record cash payments that were never actually made and would make offsetting entries into irregular accounts. Voynow should have noticed the large number of irregular transactions and failure to reconcile cash balances. Under this scheme, employees were able to steal as much as $133,000.00 from Plaintiffs.

59.     For many years, Plaintiffs' inventory financing bank, JPMorgan Chase, raised certain specific questions with Plaintiffs regarding the retained earnings accounts set forth in the various financial statements submitted to secure car inventory financing.  In response, Plaintiffs repeatedly asked Defendants to investigate these balances and to answer the bank's queries.  As it turns out, however, Karouzakis routinely made numerous manual adjusting entries to various retained earnings accounts to obscure her widespread thefts, causing substantial and irregular volatility in the retained earnings account balances each year.  While Defendants responded to the queries to the bank's satisfaction, Voynow failed to notice or report to management that the extraordinary number of irregular entries as well as the undue volatility in those accounts were highly irregular and suspicious.  In addition, at least one accounting staff employee specifically questioned defendant Franzen regarding the propriety and accuracy of manual entries to retained earnings, and still he did and said nothing to management about it.

60.     For many years, there were also a highly unusual number of uncleared checks, unresolved balances in numerous year end accounts and vendor payments without 1099's.  Voynow failed to notice or report these irregularities as well.

61.     Moreover, even after Voynow was fully on notice of the Karouzakis frauds and indictment, it continued to miss still more red flags.

62.     For example, after Karouzakis and various other untrustworthy employees were fired, Plaintiffs were forced to promote a young and relatively inexperienced bookkeeper to controller to manage the press of accounting business.  In April 2017, Plaintiffs engaged Voynow to assist and train Jackie in connection with the month ending and bank reconciliation processes.

13

63. This was only a few months after the massive employee defalcations were discovered, this was largely in response to the firings that resulted from that discovery and Voynow was fully informed regarding the nature and scope of those defalcations which it did not discover on its own.

64. Yet, even under these circumstances, Voynow failed to carefully or properly manage the April and May month ending and bank reconciliation process. In fact, Voynow continued to fail to notice and/or report a number of continuing irregularities, including a widespread differential of uncleared checks among plaintiff entities, unexplained and irregular gaps in check sequences (all in even dollar amounts), unexplained intercompany discrepancies among the affiliated dealerships and various other matters that should have been reported to management immediately, especially in light of the recent discoveries.

65. Indeed, even in the summer of 2017, Voynow's inattention permitted certain additional employees to continue to steal funds with impunity. Specifically, in June 2017, Plaintiffs' then employee Doug Filardo was in the process of stealing ACH wire transfers through a complex web of manual account entries. Although it was engaged in the bank reconciliations with Plaintiffs' new controller, Voynow had no idea. In July 2017, Plaintiffs' bookkeeper, Gladys Gallaraga, even asked Franzen to explain the transactions on the books of Star Subaru that constituted Filardo's scheme, and he did nothing. The Filardo thefts thus continued right under Franzen's nose.

66. The foregoing schemes are only examples. This is by no means an exhaustive list. Voynow's failures are and have been massive and extreme. Plaintiffs' investigation continues, and they will present at trial a comprehensive accounting of Voynow's failures.

### *Defendants' Continuous Representation of Plaintiffs*

67.    As noted, the first employee theft was discovered in December 2016.

68.    It was not until the second quarter of 2017 that the full scope of the employee thefts was discovered.

69.    On information and belief, employee thefts occurred for many years prior to that.

70.    Throughout the remainder of 2017, Plaintiffs continued to rely on Defendants for all of their accounting services and to assist in managing the fallout from the discovery of the employee thefts.

71.    During such time, Defendants continued to represent Plaintiffs in all of the foregoing respects.

72.    During such time, Plaintiffs continued to repose confidence in Defendants' professional ability generally, automobile industry expertise specifically, close working relationship with Plaintiffs' accounting staff, intimacy with Plaintiffs' accounting systems and ultimately Defendants' good faith.

73.    During such time, Plaintiffs continued to rely on Defendant's competence, care and professionalism and had no reason to question Defendants' techniques or services.

74.    It was not until the Fall of 2017, after a full review, that Plaintiffs realized that further and different representation on all accounting matters was called for.

75.    Plaintiffs initiated the termination of their relationship with Defendants on or about November 3, 2017.

76.     Defendants did not turn over all requested and required work papers until January 2018, at which time Plaintiffs' new accountants initiated their representation of Plaintiffs in the ordinary course.

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### *(Professional Malpractice)*

77.     Plaintiff repeats and realleges each and every allegation set forth above as if set forth fully herein.

78.     Under standards of care and conduct prevailing in the accounting industry generally and applicable to Voynow specifically, Defendants had an affirmative duty to Plaintiffs to undertake each and every one of its tasks for Plaintiffs with caution and care, to be vigilant for discrepancies or irregularities and to report any such findings to Plaintiffs accordingly.

79.     In addition, under Article V of the Principles of Professional Conduct of the AICPA Code of Professional Conduct, Voynow owed Plaintiffs an affirmative duty to identify and inform Plaintiffs of any fraud red flags, such as suspicious activities or internal control deficiencies.

80.     Indeed, given its special industry "focus" and expertise with automobile dealerships, its specific intimacy with Plaintiffs' operations, general standards of care and accounting conduct and Article V of the Principles of Professional Conduct of the AICPA Code of Professional Conduct, Defendants owed Plaintiffs an affirmative duty to identify and inform Plaintiffs of any specific frauds or red flags concerning employment defalcations during the course of its monthly and year end work for Plaintiffs.

81.     As set forth above more fully, Defendants failed to exercise independence and due professional care in a variety of ways, including without limitation failing to notice, investigate and/or report to management the following:

a)      large numbers of irregular manual journal entries;

b)      transactions that failed to clear the payroll cycle;

c)      large numbers of company checks that were being issued to pay personal credit card bills and other personal expenses;

d)      large numbers of company checks that bore irregular hand-written notations;

e)      large numbers of irregular company checks that were debited or credited to irregular accounts;

f)      large numbers of company checks that bore irregular control numbers flowing inappropriately through irregular accounts;

g)      large numbers of cash payment entries that were offset to irregular accounts;

h)      a number of cash balances that were not properly reconciled;

i)      a number of payments to vendors without 1099's;

j)      undue volatility and manual and/or irregular entries in the retained earnings accounts; and,

k)      large numbers of uncleared checks and unresolved account balances in numerous year end accounts.

82.     Indeed, even after certain of the employee defalcations came to light, there remained a widespread differential of uncleared checks among plaintiff entities,

17

unexplained and irregular gaps in check sequences (all in even dollar amounts), unexplained intercompany discrepancies among the dealership entities and various other matters that should have been noticed, investigated and/or reported to management.

83. Defendants' wrongful and deficient conduct proximately caused Plaintiff to suffer damages which are more fully set forth above by failing to cause Plaintiffs to arrest such misconduct earlier or in a preventative manner.

84. All such losses were reasonably foreseeable at the time Defendants were retained to provide accounting services.

85. As a result of Voynow's professional malpractice, Plaintiffs have suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $10 million, plus interest and reasonable attorney's fees, all of which continue to accrue.

## SECOND CAUSE OF ACTION AGAINST DEFENDANT VOYNOW
### *(Respondeat Superior)*

86. Plaintiff repeats and realleges each and every allegation set forth above as if set forth fully herein.

87. To the extent that the wrongful acts set forth above were those of defendants Whyte, Franzen and/or Seibel, and/or any other agent of Voynow, those acts were performed during the scope of their employment with and for the benefit of defendant Voynow.

88. All such acts were and are imputable to Voynow, and were conducted with the actual and/or apparent authority of Voynow.

89.     Based on the foregoing, defendant Voynow is liable for the wrongful conduct of its partners and agents, all in an amount to be established at trial, but which shall not be less than $10 million, plus interest and reasonable attorney's fees.

### THIRD CAUSE OF ACTION AGAINST DEFENDANT VOYNOW
### *(Breach of Contract)*

90.     Plaintiff repeats and realleges each and every allegation set forth above as if set forth fully herein.

91.     As set forth above more fully, Voynow continually promised to Plaintiffs that its special expertise and focus respecting automobile dealerships enabled it to perform a certain level of service for such clients that went above and beyond the ordinary, unspecialized accountant or firm of accountants.  Indeed, it was because of this representation that Plaintiffs retained Defendants in the first place and continued to use them each year for a variety of accounting services.

92.     In each case and in each year of service, an implied term of the contract between Plaintiffs and Defendants was that Defendants would perform their tasks with the degree of skill and care reasonably expected not just from ordinary accountants performing their ordinary professional obligations but more specifically for accountants with their extra-ordinary automobile dealership experience and focus.

93.     More specifically, in each case and in each year of service, a specific implied term of the contract between Plaintiffs and Defendants – indeed, a bedrock term of Defendants' retention for all purposes – was that Defendants would use their specialized expertise and their intimacy with Plaintiffs' operations to be vigilant for, and to alert management regarding, any material red flags concerning automobile dealership management

and controls.

94.     Accordingly, each year, Plaintiffs and Defendants entered into a contract for Defendants to perform the following specific services:

a)     Periodic consultations regarding various management and accounting issues, such as factory part reconciliations;

b)     Review and assistance of year end account balances and planning;

c)     Year-end closing of the books, including review and reconciliation of manual and adjusting entries;

d)     Preparation of tax returns and work papers for each business entity in the Star Auto Group;

e)     Preparation of individual tax returns and work papers for a number of the individual owners of Plaintiffs;

f)     Preparation of various other tax documents and related work papers, such as 1099's, sales tax filings and certain reinsurance transaction filings;

g)     Periodic advice and consultations regarding Plaintiffs' automobile inventory financing arrangement with JPMorgan Chase;

h)     Assistance hiring or training certain key personnel; and,

i)     Advice regarding operating and accounting systems.

95.     In addition, each year, during the provision of these professional services, the contract between Plaintiffs and Defendants required Defendants to be vigilant for, and to alert management regarding, any material red flags common to automobile

20

dealership management and controls.

96.     Voynow materially breached its contractual obligation to be a close and knowledgeable partner on all such accounting operations by failing to notice, investigate and/or report at least the following red flags:

      a)     numerous irregularities in the automobile dealership industry-specific form of financial statements provided to Plaintiffs' banks for financing of automobile inventories;

      b)     the failure of employees to properly process cash down payments for the purchase of vehicles;

      c)     numerous irregularities in the accounting and processing of industry wide automobile factory rebate, service and advertising programs;

      d)     gross employee abuse of automobile dealer discounts for friends and family; and

      e)     the failure of employees to properly process transactions as between interrelated dealerships.

97.     On information and belief, Defendants in fact were intimately familiar with many if not all of the foregoing programs and the type of irregularities that are endemic to the automobile dealership industry.

98.     As a result of Voynow's breaches of contract, Plaintiffs have suffered, and continue to suffer, damages consisting of overpayment for services, consequential damages from employee thefts and otherwise and other damages, all in an amount to be established at trial, plus interest and reasonable attorney's fees, all of which continue to accrue.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs Star Auto Sales of Bayside, Inc., Star Auto Sales of Queens, LLC, Star Hyundai LLC, Star Nissan, Inc., Metro Chrysler Plymouth Inc., Star Auto Sales of Queens County LLC and Star Auto Sales of Queens Village LLC respectfully pray for judgment against defendants Voynow, Bayard, Whyte and Company, LLP in an amount to be established at trial, but which shall not be less than ten million dollars ($10,000,000.00), plus interest and attorneys' fees and for any such other and further relief as this Court deems just and proper.

Dated:   New York, New York
           October 16, 2018

**TRACHTENBERG RODES & FRIEDBERG LLP**

By: _____
      Barry J. Friedberg (BF 7337)

545 Fifth Avenue
New York, New York 10017
(212) 972-2929

*Attorneys for The Star Auto Group Plaintiffs*

22